**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**TONY G. ROWE,**

      **Plaintiff,**

**vs.**                            **CIVIL ACTION NO. 3:18-CV-00333**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered February 21, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 14 and 19)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (ECF No. 14), **DENY** Defendant's request to affirm the decision of the Acting Commissioner (ECF No. 19); **REVERSE** the final decision of the Acting Commissioner; and **REMAND** this action back to the Acting Commissioner for further proceedings as stated *infra*.

**Procedural History**

      The Plaintiff, Tony G. Rowe (hereinafter referred to as "Claimant"), protectively filed his applications for Title II benefits and for Title XVI benefits on October 5, 2010, alleging disability beginning February 12, 2009 due to "bulging disc in lower back, tendon damage in left arm, etc."[1] (Tr. at 412-418, 419-424, 466-469, 471) His claims were initially denied on March 10, 2011 (Tr. at 242-247) and again upon reconsideration on June 8, 2011. (Tr. at 251-253, 254-256) Thereafter, Claimant filed a written request for hearing on June 24, 2011. (Tr. at 259-260, 261-263)

      An administrative hearing was held on August 21, 2012 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 80-109) On September 26, 2012, the ALJ entered an unfavorable decision.[2] (Tr. at 156-181)

      On December 3, 2013, the Appeals Council granted Claimant's request for review of the ALJ's decision and remanded the decision for further consideration. (Tr. at 232-235) Pursuant to the Appeals Council's Order of Remand, the ALJ held another hearing on February 3, 2015. (Tr. at 54-79) At the conclusion of the hearing, the ALJ advised that he would schedule Claimant for additional physical and mental consultative examinations. (Tr. at 78, 1778-1782, 1783-1788) The ALJ also issued medical interrogatories to Ronald Kendrick, M.D., an orthopedic surgeon and impartial medical expert. (Tr. at 1888-1896) Subsequently, the ALJ held a supplemental hearing on September 24, 2015. (Tr. at 42-53) On April 25, 2016, the ALJ issued the instant unfavorable decision. (Tr. at 12-41)

---

[1] Claimant filed a previous application for DIB benefits on August 13, 2009, alleging disability since February 12, 2009. (Tr. at 15) An ALJ issued an unfavorable decision on September 22, 2010. (Tr. at 113) That decision was not appealed, therefore the alleged onset date for the present applications was amended to September 23, 2010. (Tr. at 15-16)

[2] While Claimant's request for review was pending before the Appeals Council, Claimant filed subsequent claims for DIB and SSI on December 13, 2012. (Tr. at 16) Pursuant to the Order or Remand issued by the Appeals Council, the ALJ associated the December 2012 claims with these claims. (Id.)

The ALJ's decision became the final decision of the Acting Commissioner on December 22, 2017 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7) On February 20, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) In response, the Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9 and 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 14), and in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 19). Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 37 years old as of the date of filing the instant applications and is defined as a "younger person" throughout these proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 27) Claimant graduated high school and last worked as a truck driver on or about February 12, 2009 when he suffered work-related injuries to his lower back, neck, left elbow and shoulder when the tractor-trailer he was driving was blown over during a windstorm. (Tr. at 64-65, 1361, 1420, 1425)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2013. (Tr. at 18, Finding No. 1) Next, the ALJ determined

that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since September 23, 2010. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease of the cervical spine and lumbar spine; lateral epicondylitis of the left elbow, status-post surgery; carpal tunnel syndrome, status-post release; osteoarthritis; myofascial pain syndrome; morbid obesity; obstructive sleep apnea; depression and anxiety. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 19, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to

> lift and carry up to 15 pounds occasionally, 10 pounds frequently. During an eight-hour day, he can sit a total of six hours (one hour at a time), and can stand and/or walk a total of four hours (30 minutes at one time). He can frequently reach in all directions (including overhead), handle, finger, feel, and push/pull with both hands. He can frequently operate foot controls with both feet. The claimant can never climb ladders or scaffolds. He can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. He can never be exposed to unprotected heights or moving mechanical parts. He can occasionally operate a motor vehicle. He can occasionally be exposed to vibrations. He can frequently be exposed to humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold; and extreme heat. The claimant can understand, remember, and carry out simple instructions. He can have only occasional changes in the work setting. He can occasionally interact with coworkers. He can frequently interact with the public and supervisors.

(Tr. at 21, Finding No. 5)

At step four, the ALJ found that Claimant is unable to perform any past relevant work. (Tr. at 26, Finding No. 6) The ALJ then determined that based on Claimant's age, education, ability to communicate in English, and the immateriality of transferability of Claimant's job skills, that the RFC supported a finding that there are other jobs in the national economy that Claimant can perform. (Tr. at 27, Finding Nos. 7-10) Ultimately, the ALJ determined that Claimant had not been

under a disability from September 23, 2010 through the date of the decision. (Tr. at 28, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two main grounds of error in support of his appeal.

The first is that the ALJ failed to consider all the medical evidence of record concerning Claimant's physical impairments, especially with respect to the hypothetical question posed to the vocational expert. (ECF No. 14 at 13) The controlling RFC fails to fairly consider Claimant's manipulative impairments as the medical record of evidence shows he had suffered from carpal tunnel syndrome for many years and that by the time his release surgery was approved by insurance, the damage was already done and could not be corrected by surgery. (Id. at 13-14) The ALJ also ignored the evidence that Claimant uses a cane which had been prescribed to him in July 2010. (Id. at 13) Claimant argues that the ALJ's disregard of his use of a cane comes from two State agency consultants' opinions that he does not require the use of a cane, although neither expert gave any factual support or reasoning for these opinions despite the conflicting evidence of record. (Id.) This error is reflected in the controlling RFC which was posed as a hypothetical to the vocational expert. (Id. at 14) The error was not harmless, because the vocational expert explicitly testified that these manipulative restrictions would have rendered Claimant disabled. (Id.)

The second alleged ground of error is that the ALJ did not properly consider and weigh the opinion evidence provided by Claimant's treating physician, Bal Bansal, M.D. (Id. at 15) The ALJ never addressed Dr. Bansal's opinion which consisted of a three page Lumbar Spine Residual Functional Capacity Questionnaire dated April 5, 2011; if the ALJ had given this opinion

controlling weight, as the Regulations then provided, Claimant would have been found disabled. (Id. at 15-16) Further, Dr. Bansal's opinion is consistent with the medical record. (Id. at 17) Claimant asserts that because the ALJ failed to evaluate Dr. Bansal's opinion as provided by the Regulations, this constitutes reversible error. (Id. at 17-18)

Claimant asks the Court to reverse and remand the final decision for an award of benefits or for a correction of the errors made below. (Id. at 18-19)

In response, the Commissioner states that the ALJ's RFC finding and hypothetical question to the vocational expert were supported by substantial evidence, and that despite Claimant's contention that the ALJ failed to account for his limitations from carpal tunnel syndrome, the voluminous record of evidence provides otherwise. (ECF No. 19 at 17-20) In light of this evidence, the ALJ was entitled to establishing the appropriate RFC, and by correlation, the controlling hypothetical, which demonstrated Claimant was still capable of performing other jobs as identified by the vocational expert, therefore supporting the finding that he was not disabled. (Id. at 20-21)

The ALJ accounted for Claimant's credibly-established limitations, including those associated with his use of a cane, which was not determined to be "medically required" as defined by Social Security Ruling (SSR) 96-9p, therefore the ALJ was under no obligation to include further limitations in the RFC to that extent. (Id. at 21) Claimant has stated he was prescribed the cane, however, there is no prescription for it in the record. (Id.) Further, although Dr. Bansal gave Claimant a cane to help him walk better, the medical record of evidence shows that Claimant had normal gait and station and normal muscle strength and tone, leading to two medical experts to opine that Claimant did not need a cane; the ALJ was entitled to rely upon this evidence when making the RFC assessment. (Id.)

7

Contrary to Claimant's argument, the ALJ properly accounted for limitations associated with Claimant's carpal tunnel syndrome because he limited him to only frequent reaching, handling, fingering, feeling, and pushing/pulling with the upper extremities. (Id. at 22) The Commissioner argues that this finding is consistent with Dr. Bansal's June 2010 opinion that Claimant "avoid repetitive hand motion" and with Dr. Kendrick's April 2015 opinion that Claimant could perform frequent upper extremity motions. (Id.) The Commissioner further contends that Claimant does not identify what additional limitations the ALJ should have accounted for with respect to his carpal tunnel syndrome, and further, the medical record shows that after Claimant's release surgeries in August and September 2013, there is no further treatment for this condition. (Id.) Therefore, the ALJ's RFC determination is supported by substantial evidence. (Id.)

Next, the Commissioner argues that the ALJ's evaluation of Dr. Bansal's opinions was consistent with the applicable law, and appropriately found that other than his June 2010 opinion, the ALJ discounted the remainder of Dr. Bansal's opinions because they were inconsistent with the evidence of record. (Id. at 23) The Commissioner points out that Dr. Bansal's extreme limitations were also inconsistent with his own treatment records and examination findings. (Id. at 24) The ALJ also explained that Dr. Bansal's extreme limitations did not indicate he was familiar with Social Security disability requirements or with the remaining medical evidence of record. (Id.) The Commissioner states that Claimant's argument with the ALJ's failure to mention Dr. Bansal's April 2011 opinion is without merit because the law is clear there is no particular language or format when formulating an RFC analysis. (Id. at 25) Because the ALJ expressly discussed Dr. Bansal's numerous opinions and compared these with the medical evidence of record, and

explained the reasons for giving his opinion little weight, the ALJ's RFC analysis complied with the Regulations. (Id.) The Commissioner asserts that Claimant essentially is asking this Court to re-weigh the evidence related to his impairments which is impermissible. (Id.)

The Commissioner asks the Court to affirm the final decision, because it is supported by substantial evidence; to the extent Claimant asks for a reversal for payment of benefits, the Commissioner points out that the proper remedy is remand, not reversal. (Id. at 26, n.8)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Records Prior to Application/Established Onset Date:

Claimant was in a truck accident on February 12, 2009. (Tr. at 1419) The medical records following the accident reveal that Claimant was diagnosed with cervical and lumbosacral strain, but that he did not lose consciousness, sustain any fractures, and was not hospitalized as a result of his injuries. (Tr. at 1420-1423, 1429) Diagnostic images from several weeks after the accident reveal a normal left elbow (Tr. at 1433) and some mild degenerative disc disease at L4-5. (Tr. at 1434) During an evaluation on February 17, 2009, Claimant was placed on off-work status and was advised that he would likely be off work for "several weeks" with a potential return to work date of March 9, 2009. (Tr. at 1363) The records also indicate that he "likely [sustained] a soft tissue injury, but may take up to 6 weeks to completely resolve." (Id.) Because he was doing so poorly with pain and range of motion, it was recommended that he quickly start physical therapy. (Id.)

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

From July through December 2009, Claimant was treated conservatively at Generations Physical Therapy for his lower back pain, elbow and bilateral wrist pain. (Tr. at 660-804, 805-820, 821-895) It was noted several times during his treatment, specifically on September 29, 2009 and November 24, 2009, that one of the "Goals" was for Claimant to "demonstrate normal gait without an assistive device (not met)" (Tr. at 716-718, 719-721, 809-810, 812) Claimant also received lumbar steroid injections throughout 2009 at Tri-State Neuroscience Center. (Tr. at 1425-1439)

In December 2009, Bal K. Bansal, M.D., Claimant's treating physician, ordered a nerve conduction study/EMG and concluded that the results were consistent with moderate to severe degree of bilateral median nerve entrapment and neuropathy; he did not find evidence of cervical radiculopathy or myopathy. (Tr. at 1123)

In January 2010, Dr. Bansal examined Claimant with regard to his complaints of lower back pain that radiated into his legs. (Tr. at 1148-1149) At that time, a lumbar MRI revealed a slight bulging at L4-5 without disc protrusion and possible very mild spinal stenosis; a cervical spine MRI that showed minimal degenerative disc changes with no protrusion or cord lesion. (Tr. at 1059, 1150-1151)

During an examination in March 2010, Dr. Bansal noted that Claimant had spasms in the cervical and lumbosacral area with mild limitation of cervical and lumbar spine movement, but a negative straight-leg raise, and positive Tinel's sign in the median nerves. (Tr. at 1059) Claimant's examination was otherwise "unremarkable" and revealed normal mental status, cranial nerves, muscle tone, muscle strength, reflexes, coordination, gait, station, and ability to tandem walk. (Id.) Dr. Bansal noted that the nerve conduction study and EMG "clearly showed moderate to severe degree of bilateral median nerve entrapment neuropathy . . . if something is not done [Claimant]

10

might lose the use of his hands." (Id.) Dr. Bansal referred Claimant to Stanley S. Tao, M.D. of

Scott Orthopedics for surgical intervention for his carpal tunnel syndrome. (Id.) Dr. Bansal opined

that Claimant "was totally disabled to be employed into any sustained gainful employment, even

light-duty work, even on a part-time basis." (Tr. at 1060)

Claimant returned to Dr. Bansal in April 2010, and an examination was unchanged from the

prior month, as he continued to complain of severe neck and back pain. (Tr. at 1058) Dr. Bansal

noted that Claimant had an impairment rating of 19%, but that his pain was not under good control,

therefore he prescribed methadone. (Id.) Dr. Bansal also advised Claimant to lose weight, and

again indicated that he could not return to any gainful employment. (Id.)

In June 2010, Claimant reported that he still had pain, which at times he described as

"unbearable", but methadone "help[ed] the pain the best out of everything he had taken in the past."

(Tr. at 1056) An examination revealed significant spasms in the cervical, thoracic, and lumbosacral

areas with mild limitation of movements and a negative straight leg raising test. (Id.) The rest of

the examination, including mental status, cranial nerves, muscle tone, strength, reflexes,

coordination, gait, station and tandem walk were "basically unremarkable" except for positive

Tinel's sign. (Id.) Dr. Bansal told Claimant to avoid repetitive hand motion and continue using the

wrist splints. (Tr. at 1057)

In July 2010, Claimant reported that his symptoms were better with methadone and Celexa.

(Tr. at 1055) An examination was identical to the prior appointment. (Id.) Dr. Bansal again noted

that Claimant was "totally and permanently disabled" from any employment, "particularly which

would require constant bending, stooping or lifting":

> Anytime he does any bending, stooping or lifting more than 5 pounds, walks more
> than 25 minutes or stands more than 15-20 minutes or lies down for more than half

11

> an hour he has to frequently change posture in order to get some relief. I gave him a cane to help him to walk better because at times both legs give out and his knee pain also gets worse. However, I encouraged [Claimant] to go ahead and go to the physical therapy and do some aquatic exercises.

(Id.) Claimant's condition remained largely stable throughout September and November 2010. (Tr. at 1139-1141)

With respect to his left elbow injury, Claimant received injections, however, since they were not relieving his pain, Dr. Tao performed a tennis elbow release surgery on September 10, 2009 that the record indicates had good results. (Tr. at 1091, 1110, 1399, 1401, 1402) However, since the release surgery, Claimant reported to Dr. Tao that he began experiencing numbness and tingling in his left hand that Dr. Tao opined was consistent with carpal tunnel syndrome as well as cubital tunnel syndrome; Dr. Tao rated Claimant's pain symptoms "between mild and moderate." (Tr. at 1112)

<u>Records Related to Claimant's Spinal Impairments During Relevant Period:</u>

As noted *supra*, Dr. Bansal's examination findings remained unchanged in September and he reported that his symptoms were better. (Tr. at 1141) Dr. Bansal's examination findings in November 2010 remained unchanged (Tr. at 1139), although Claimant was complaining about numbness in his hands. (Tr. at 1140) By January 2011, Claimant reported that his teeth were brittle from methadone, and he wanted to stop using it. (Tr. at 1137) He also reported that he used the cane to walk, and that he was having symptoms from carpal tunnel syndrome "particularly when he doesn't wear wrist splints." (Id.) Examination findings were identical to the previous examinations, which revealed spasms in the cervical, thoracic and lumbosacral areas with mild degree of limitation and a negative straight-leg raise. (Id.) Claimant had positive Tinel's signs, but no sensory change or weakness, and unremarkable mental status, cranial nerves, muscle tone,

muscle strength, reflexes, coordination, gait, station, and he could tandem walk. (Id.) Dr. Bansal discontinued methadone and prescribed oxycodone, and advised Claimant to lose weight. (Id.)

In April 2011, Dr. Bansal completed a lumbar spine RFC questionnaire. (Tr. at 1245-1248) Dr. Bansal noted that Claimant had sensory loss, reflex changes, tenderness, muscle spasm, weakness, swelling, weight change, and impaired sleep. (Tr. at 1246) He also opined that Claimant's pain is constant throughout the day; that he could walk approximately ½ block without rest or severe pain; that he can sit for 5-10 minutes before needing to get up, and could stand for 5-10 minutes before needing to sit or walk around; and that he could sit or stand/walk for less than two hours each in an eight-hour workday. (Tr. at 1246-1247) Dr. Bansal noted that Claimant would need to walk every 10 minutes for up to nine minutes at a time, that he required a job that permitted shifting positions at will, as well as unscheduled breaks during an eight-hour workday. (Tr. at 1247) Dr. Bansal also noted that Claimant needed to elevate his legs during the work day; required a cane or assistive device; could rarely lift 10 pounds or less; could never twist, crouch, squat, or climb ladders; could rarely stoop or climb stairs; had significant limitations with reaching, handling, and fingering; and would be absent more than four days per month. (Tr. at 1247-1248)

In June 2011, Dr. Bansal noted that there were no significant changes from the prior examination; he opined that Claimant "is currently disabled because of continuation of the pain in the cervical area, thoracic area and lower back with aching pain in the arms and legs." (Tr. at 1517) An examination revealed spasms in the cervical, thoracic, and lumbosacral areas with mild degree of limitation of movement, and unremarkable mental status, cranial nerves, muscle tone, strength, reflexes, coordination, gait, station, and ability to tandem walk. (Id.) Dr. Bansal again opined that Claimant was disabled from any employment, particularly jobs that required constant bending,

stooping, or lifting. (Id.)

      In September 2011, Claimant reported to Dr. Bansal that his pain was at a three to four on a 10-point scale with medication. (Tr. at 1515) By December 2011, Dr. Bansal noted that Claimant was "doing very well as long as he takes the medication." (Tr. at 1514) The examination findings were identical to those from June 2011. (Id.) Dr. Bansal recommended Claimant avoid excessive bending, stooping, or lifting, but "[o]therwise try to be as active as possible." (Id.) In March 2012, Dr. Bansal noted that Claimant's "pain is definitely much better than before." (Tr. at 1513) An examination was identical to one performed in June 2011, except for a "subjective feeling of weakness" in the extremities and a "subjective feeling of decreased pin and temperature" in the extremities. (Id.) Examination findings in June, September, and December 2012 were largely unchanged. (Tr. at 1510-1512)

      In February 2013, Claimant reported that as long as he used medication, he "feels somewhat better but anytime he does any bending, stooping or lifting more than two to three pounds, the pain in the cervical area and lower back worse." (Tr. at 1595) An examination in May 2013 was unchanged; it was noted that Claimant "is still having pain in the cervical area, thoracic area and lower back with aching pain in the arms and legs probably from the fibromyalgic syndrome. The [Claimant] has no pain in the cervical, thoracic or lumbosacral dermatome." (Tr. at 1594) Dr. Bansal recommended that Claimant "avoid high medium to heavy duty work" and to continue to take the same medications. (Id.)

      An examination in September 2013 revealed mild spasms in the cervical, thoracic, and lumbosacral areas with mild limitation of movement and a negative straight leg raise. (Tr. at 1666) Claimant's mental status, cranial nerves, muscle tone, strength, reflexes, coordination, gait,

station and tandem walk were otherwise "unremarkable" except for subjective feelings of weakness, decreased pin prick, and temperature in the extremities; Dr. Bansal again advised Claimant to "avoid high medium to heavy duty work." (Id.) Claimant had an MRI in October 2013 which revealed a normal lumbar alignment with "minimal annular degenerative disc bulge at L5-S1" the overall impression being: "[s]table MRI lumbar spine demonstrating mild degenerative disc disease with annular disc bulge producing mild bilateral neural foraminal compromise and borderline central canal stenosis at L4-5." (Tr. at 1675)

From October 2013 through September 2014, Claimant treated with the Cabell Huntington Hospital Pain Management Clinic for his chronic lower back pain. (Tr. at 1763-1775)

Claimant did not return to Dr. Bansal until April 2015,[4] at which time a neurological examination showed no significant change; Dr. Bansal diagnosed him with chronic cervical, thoracic and lumbosacral degenerative disc disease as a result of degenerative osteoarthritis. (Tr. at 1909) Dr. Bansal recommended that Claimant avoid bending, stooping and lifting and opined that Claimant was disabled and could never be employed into any sustained gainful employment, "even light duty work, even on a part-time basis." (Id.)

Records Related to Carpal Tunnel Syndrome During Relevant Period:

An examination with Dr. Bansal in November 2010 again revealed positive Tinel's sign at the median nerves. (Tr. at 1139) In December 2010, Claimant reported to Dr. Tao that he had pain with lifting, gripping and driving. (Tr. at 1131) Dr. Tao diagnosed Claimant with carpal tunnel syndrome, cubital tunnel syndrome and epicondylitis. (Tr. at 1132) Dr. Tao requested from Workers Compensation bilateral carpal and cubital releases with four weeks of therapy per side.

---

[4] The record indicates Dr. Bansal lost his medical license in 2014. (Tr. at 1769) However, there are no further records from Dr. Bansal since April 2015.

(Id.)

Dr. Bansal's examinations in January and June 2011 continued to show positive Tinel's sign for both median and ulnar nerves. (Tr. at 1137, 1517) Examinations in September 2011 and December 2011 do not mention any carpal tunnel symptoms and contain no examination findings related thereto. (Tr. at 1514-1515) In March 2012, neurological examinations with Dr. Bansal were unremarkable except for subjective feelings of weakness, and subjective feeling of decreased pin and temperature in the extremities. (Tr. at 1513) Dr. Bansal recommended a nerve conduction study (NCS) and EMG. (Id.) In April 2012, Claimant underwent NCS tests which confirmed moderate bilateral carpal tunnel syndromes. (Tr. at 1353-1354)

By April 2013, Claimant saw Warren Shaver, M.D. with complaints of wrist pain, numbness in his mid to lateral fingers, weakness and grip strength; Dr. Shaver observed that Claimant wore wrist splints and reported that they help although his symptoms have grown worse and that he "would like to consider surgery." (Tr. at 1723) In June 2013, Claimant had another NCS on his upper extremities that revealed a markedly severe median mononeuropathy at the wrist consistent with a diagnosis of carpal tunnel syndrome; a surgical consult was recommended. (Tr. at 1619)

By July 2013, Claimant saw Justin Jones, M.D. for complaints of numbness in the thumb, index, and long fingers. (Tr. at 1642) On examination, Claimant had normal coordination; normal gait and station; subjective numbness in the thumb, index, and long digits; Claimant was slightly tender over the left pronator; had positive Tinel and Phalen's sign at the wrist; but negative cubital tunnel symptoms; and symmetric muscle strength. (Id.) Dr. Jones noted that while steroids may have some benefit, Claimant indicated he was allergic to steroids, but due to the progression of his

symptoms, surgery was recommended. (Tr. at 1642-1643) Dr. Jones advised Claimant that the purpose of the surgery was to remove the compressive forces from the nerve as opposed to making it better itself, and that his symptoms may not change and may get worse, however, the surgery is necessary to remove pressure and not to ensure recovery. (Tr. at 1643)

In August 2013, the following month, Claimant underwent a carpal tunnel release on the right, dominant hand. (Tr. at 1672) At the two-week post operation appointment, Claimant reported that the deep aching had abated, but his preoperative sensory deficit had not changed. (Tr. at 1671) During a follow up appointment in September 2013, Claimant reported that he was doing well following surgery and wanted to proceed with the carpal tunnel release on the left, as his symptoms had become a little bit worse (Tr. at 1669); on September 27, 2013, Claimant underwent a left open carpal tunnel release. (Tr. at 1690) There are no further treatment records relating to Claimant's carpal tunnel syndrome.

State Agency Consultant Opinions:

In February 2011 Stephen Nutter, M.D. examined Claimant. (Tr. at 1221-1226) Dr. Nutter noted that Claimant had a limping gait and used a cane in his left hand but that he did not require a handheld assistive device. (Tr. at 1222) On examination, Claimant was stable at station and uncomfortable supine and sitting. (Id.) His left forearm was tender to the touch and he had pain with movement and tenderness in his right elbow, and both shoulders; but there was otherwise no warmth, swelling, tenderness, crepitus or laxity. (Tr. at 1223) Claimant had Tinel's sign at the right and left elbows, but was negative at the right wrist. (Id.) Claimant had no hand atrophy and could make fists bilaterally. (Id.) His left hand was tender, but his right hand was not and displayed no redness, warmth, or swelling. (Id.) Dr. Nutter noted that Claimant gave "submaximal voluntary

effort" when asked to squeeze his fingers, but that his best estimate was that Claimant had 5/5 grip strength on right and 4/5 on the left. (<u>Id</u>.) Claimant was able to write and pick up coins with both hands. (<u>Id</u>.) He had knee pain with movement, but no crepitus or laxity, and some reduced knee range of motion due to subjective complaints of back pain. (Tr. at 1224) Claimant could stand on one leg without difficulty, and exhibited no hip joint tenderness, warmth, or swelling (Tr. 1224). A neurological exam revealed intact cranial nerves, without clonus or atrophy. (<u>Id</u>.) Claimant could walk on his heels and toes and perform a tandem gait without difficulty. (<u>Id</u>.) Ultimately, Dr. Nutter opined that Claimant had no sensory abnormalities; normal reflexes; and normal muscle strength; but some range of motion abnormalities in the cervical and lumbar spines. (Tr. at 1225)

On March 1, 2011, Atiya M. Lateef, M.D. reviewed the record and completed a physical RFC assessment. (Tr. at 134-136). Dr. Lateef opined that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand or walk about six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. (Tr. at 135) She further opined that Claimant could perform occasional postural maneuvers, but had to avoid concentrated exposure to cold and vibration. (Tr. at 135-136)

On May 10, 2011, Narendra Parikshak, M.D. completed a physical RFC assessment. (Tr. at 1249-1256) She opined that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand or walk about six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (Tr. at 1250) In addition, she opined that Claimant could occasionally climb ramps/stairs and ladders/ropes/scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 1251) She noted no manipulative limitations; she opined that Claimant should avoid concentrated exposure to extreme cold and vibration, and even

moderate exposure to hazards. (Tr. at 1252-1253). Dr. Parikshak noted that Claimant's "symptoms [were] partially credible", noting that while "[Claimant] has limitations in [range of motion] of cervical and lumbar spine[,] X-ray lumbar spine is normal. There is no atrophy, strength, or sensory abnormality, reflexes are normal. (Tr. at 1254)

In September 2013, Dominic Gaziano, M.D. reviewed the record and completed a physical RFC assessment. (Tr. at 208-209) Dr. Gaziano opined that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand or walk about six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (Tr. at 135) He further opined that Claimant could perform occasional postural maneuvers, but had to avoid concentrated exposure to cold and heat, vibration, hazards, and environmental irritants. (Tr. at 135-136)

Dr. Nutter examined Claimant again in March 2015. (Tr. at 1778-1782). On examination, Claimant again used a cane and had a limping gait, and Dr. Nutter again stated that Claimant did not require a handheld assistive device. (Tr. at 1779) Dr. Nutter noted that Claimant was stable at station and comfortable sitting, but uncomfortable in the supine position. (Id.) On examination, Claimant's shoulders, elbows, and wrists were non-tender and exhibited no redness, warmth, or swelling. (Tr. at 1780) His hands exhibited no tenderness, redness, warmth, swelling, or atrophy, and he could make fists bilaterally. (Id.) Claimant squeezed Dr. Nutter's fingers with a "good firm grip," demonstrated 5/5 grip strength bilaterally, was able to pick up coins and write with both hands without difficulty; Dr. Noted Claimant had normal range of motion in his fingers. (Id.) Claimant had no tenderness, redness, warmth, swelling, fluid, crepitus, or laxity in his knees, ankles, and feet, but had limited range of motion in the knees due to back pain. (Tr. at 1780-1781) Claimant had pain and tenderness in the cervical spine, but no evidence of spasm. (Tr. at 1781) He

19

was tender from T7 to L5, and had limited straight leg raise due to resistance, but was able to stand on one leg and could forward bend to 55 degrees. (Id.) He had no hip joint tenderness, redness, warmth, swelling or crepitus, and had hip range of flexion to 100 degrees. (Id.) He had normal muscle strength in the upper and lower extremities; no atrophy; no sensory abnormalities; no clonus; could walk on his heels and toes; and perform a tandem gait; but could not squat due to complaints of back and left leg pain. (Id.) In sum, Dr. Nutter noted that Claimant had pain, tenderness, and decreased range of motion of the cervical and lumbar spine with some tenderness in the thoracic spine; he noted that sensory testing, strength testing and reflex testing were intact; though there was no definite evidence of radiculopathy, Dr. Nutter could not rule it out due to Claimant's complaints of pain down his left leg when squatting and straight leg testing being limited. (Tr. at 1781)

In April 2015, Ronald Kendrick, M.D. completed medical interrogatories and indicated that Claimant did not meet Listing 1.04 because the record was devoid of evidence of neurologic deficit or ineffective ambulation. (Tr. at 1889) Dr. Kendrick also completed a physical RFC and opined that Claimant retained the capacity to lift 20 pounds occasionally and 10 pounds frequently; sit for one hour at a time; stand and walk for 30 minutes at a time; sit for six hours in an eight-hour workday; and stand and walk for four hours in an eight-hour workday. (Tr. at 1892) Dr. Kendrick also opined that Claimant did not require a cane to ambulate. (Id.) In addition, Dr. Kendrick opined that Claimant could perform frequent reaching, handling, fingering, feeling, and pushing and pulling with both hands; frequently use foot controls; occasionally perform postural activities, but never climb ladders or scaffolds; and could have no exposure to unprotected heights or moving mechanical parts, occasional exposure to vehicles and vibrations, and frequent exposure to

humidity, dust, and extreme temperatures. (Tr. at 1892-1895)

Claimant's Function Reports:

In a November 2010 Function Report completed in connection with his application for disability benefits, Claimant reported that he cared for his pet cat; tended to personal care; prepared simple meals such as sandwiches and frozen dinners; cleaned; and shopped in stores. (Tr. at 486-489) He also reported that he could drive and ride in a car and visited with his parents once a week. (Tr. at 489-490) Claimant indicated that he used a cane at "different times" when he had a lot of pain. (Tr. at 492)

In a 2011 Function Report, Claimant reported that he lived with an 18-year-old foster child. (Tr. at 501) He also reported that he could shop in stores for food and household goods. (Tr. at 509) In April 2011, Kelli Bell submitted a Third-Party Function Report. (Tr. at 516-524) She reported that Claimant was able to drive and ride in a car, go out alone, shop in stores, and that he spent time talking on the phone and visiting with family and friends. (Tr. at 519-520)

In a 2013 Function Report, Claimant reported that he could prepare sandwiches and frozen meals, but that his mom performed all his household chores. (Tr. at 593) He also indicated that he did not drive, but could ride in a car, and was able to shop in stores. (Tr. at 593-594)

**The Administrative Hearings**

Claimant Testimony:

During the administrative hearing on August 12, 2012, Claimant testified that he was prescribed a cane to assist him with walking, although his left leg goes out for whatever reason and he has fallen a couple of times. (Tr. at 87)

At the February 3, 2015 administrative hearing, Claimant testified that he lived alone in a

mobile home. (Tr. at 66) He testified that he owned around 20 acres although he needed friends and family to maintain it because he is unable to get around. (Tr. at 67) He confirmed that he had not worked since 2009, and that initially he was hopeful that he could return to work. (Tr. at 67-68) He stated that he is unable to work because of back and leg pain and numbness. (Tr. at 68) He also testified that due to the ongoing numbness and tingling in his hands, he loses his grip and drops things on a daily basis. (Tr. at 68-69) Claimant testified that the surgery has helped some, and that his hands do not throb and swell as much, but he still drops things and is unable to pick up small things such as coins or larger things such as cups. (Tr. at 69-70)

Claimant testified that his back problems causes him difficulty with walking; on a good day he can walk about a block to a block and a half, and on a bad day about half a block. (Tr. at 70) He also has problems standing and he is "on the move all day long, even at nighttime." (Tr. at 70-71) Sitting is also problematic, and he cannot sit in one position for more than a few minutes. (Tr. at 71) His left leg will give out and has caused him to fall on numerous occasions. (Id.)

Claimant has a few friends and sees his parents regularly. (Tr. at 75)

During the September 24, 2015 hearing, Claimant testified that his pain had worsened since the last hearing. (Tr. at 46) He confirmed that he takes his cane with him wherever he goes. (Id.)

<u>Gina Baldwin, Vocational Expert ("VE") Testimony:</u>

The VE characterized Claimant's past work as a truckdriver as medium and semiskilled and his other past work as a material handler as heavy and semiskilled, though as he performed it, at the very heavy exertional levels. (Tr. at 48) The ALJ asked the VE whether work was available to a hypothetical individual with Claimant's vocational profile and the controlling RFC, *supra*, to which the VE responded that the individual could perform unskilled sedentary jobs, such as a

weigher, final assembler, and sorter. (Tr. at 48-49) The VE testified that if the individual needed to use a handheld assistive device at all times when standing, then the individual could not do sedentary work. (Tr. at 49) The VE testified that if the individual were more limited to only occasionally handling, fingering, and feeling with both hands, then there would be no work. (Tr. at 50)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). The Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

<u>Evaluation of Treating Physician Opinion Evidence:</u>

As stated previously, Claimant argues that the ALJ failed to consider his treating physician's opinion evidence with respect to his manipulative limitations due to carpal tunnel syndrome as well as his use of a cane. Basically, Claimant's argument is that the ALJ's adoption of the State agency consultants' opinions that Claimant did not require a cane, over his own treating physician's, without any consideration of the contradictory evidence of record, resulted in error at step five because the vocational expert testified that such manipulative limitations precluded all work for Claimant. See, generally, Meadows v. Colvin, No. 1:14-cv-15147, 2015 WL 3820609 (S.D.W. Va. June 18, 2015).

As noted *supra*, the ALJ determined that Claimant's carpal tunnel syndrome, status-post release was a severe impairment because it caused significant limitations in his ability to perform basic work activities. (Tr. at 18) However, the ALJ found that the evidence concerning Claimant's carpal tunnel syndrome did not satisfy the requirements of Listing 11.00. (Tr. at 19) Regarding Claimant's degenerative disc disease of the cervical and lumbar spine, although severe impairments, the ALJ also found that the evidence of record did not satisfy Listing criteria, specifically because Claimant had no ambulatory deficits as described in Listings 1.00B(2)(b) and 1.00B(2)(c): in short, the ALJ determined the evidence did not support a finding that Claimant was unable to ambulate "without the use of a hand-held assistive device that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, §1.00B(2)(b)) (Id.)

With regard to the evidence concerning Claimant's manipulative limitations from these impairments, the ALJ noted that in Claimant's written filings he reported "difficulties with most all personal care tasks" however, the ALJ also noted that Claimant indicated being capable of attending his own needs, presenting "more often than not" with adequate grooming/hygiene,

"traveling in unfamiliar places or using public transportation", driving, preparing simple foods, completing routine household chores such as dishes, mopping, etc., shopping for necessities or groceries, and when he was involved with his fiancée in January 2011, he reported helping getting her kids ready for school. (Tr. at 19-20) The ALJ further noted that in Claimant's written filings, he stated he is unable to lift over 10 pounds and cannot bend, sit, stand or walk. (Tr. at 22, 486-493, 501-513, 565-573, 591-599) The ALJ recognized that as a result of his impairments, Claimant "uses a cane and wears back and wrist braces." (Tr. at 22) The ALJ acknowledged that Claimant "described limited benefit to all treatment measures to date" and that he experiences numbness of both feet and hands, which causes him to drop objects. (Id.) The ALJ further acknowledged that Claimant stated that he must stop to rest after walking "maybe a block" and again, that he walks with a cane; he also noted Claimant's testimony during the February 2015 hearing "that his legs tend to give out, causing frequent falls. His hands swell, causing him to lose his grip." (Id.)

The ALJ then compared Claimant's complaints with the medical evidence of record, noting that one Functional Capacity Evaluation was "considered invalid due to the claimant's self-limiting effort." (Tr. at 24, 1115)[5] The ALJ noted that neurological examinations found no significant findings (Tr. at 24, 1172)[6] and that consultative examiner Dr. Nutter opined that Claimant "did not require a handheld assistive device and gave submaximal effort during grip strength testing." (Tr. at 24, 1222-1223)[7] The ALJ also noted that Claimant "reported that he did

---

[5] The record indicates that Dr. Tao requested this in order to complete Claimant's functional capacity evaluation in connection with his work-related tractor-trailer rollover injuries. The evaluation was completed on December 3, 2009. (Tr. at 1115)
[6] This record is dated July 6, 2009 and concerned the neurological consultation by Brett A. Osborn, D.O. in connection with Claimant's work-related injury. (Tr. at 1172)
[7] This concerns the February 8, 2011 internal medicine examination performed by Dr. Nutter. (Tr. at 1291-1226)

well following carpal tunnel release surgery." (Tr. at 24, 1669)[8] The ALJ reviewed the evidence from Dr. Kendrick, particularly the findings that Claimant retained the ability to "lift and carry up to 15 pounds occasionally, 10 pounds frequently", "stand and/or walk a total of four hours (30 minutes at one time)" as well as "frequently reach in all directions (including overhead), handle, finger, feel, and push/pull with both hands"; also that Dr. Kendrick "concluded that the claimant did not require the use of a cane to ambulate." (Tr. at 24, 1888-1896)

As pointed out by the Commissioner, the SSA issued Social Security Ruling ("SSR") 96-9p providing further guidance when the issue of hand-held assistive devices arises:

> **Medically required hand-held assistive device:** *To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.*
>
> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

---

[8] This is a treatment note dated September 25, 2013 from Steven R. Novotny, M.D., who assumed Claimant's care following his surgical treatment (Tr. at 1669-1670)

See, *Titles II and XVI: Determining Capability to do Other Work--Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work*, SSR 96-9p, 1996 WL 374185, at *7. (**bold** in original; *italics* supplied)

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.00B2b provides the following definitions:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Of interest here is that at no time did the ALJ address Dr. Bansal's assessments contained in the Lumbar Spine Residual Functional Capacity Questionnaire dated April 5, 2011 (Tr. at 1245-1248), although the functional capacity assessments provided by Drs. Nutter and Kendrick were considered in the ALJ's final RFC determination. Dr. Bansal's responses to the residual functional capacity questionnaire are as follows:

1.  Claimant's diagnoses include cervical and lumbosacral sprains;

2.  that his prognosis is poor;

3.  that these impairments are supported by the clinical findings in Claimant's physical exams, x-rays, and EMG-Nerve Conduction Test;

4.  that his impairments cause insomnia, severe lumbar pain that radiates into his feet; cervical pain, fatigue, and depression;

5.  that positive objective signs of Claimant's symptoms include sensory loss, reflex changes, tenderness, swelling, muscle spasm, muscle weakness, weight change, and impaired sleep;

6.  that Claimant's impairments are reasonably consistent with the symptoms and functional limitations;

7.  that during a typical workday Claimant's pain and symptoms are severe enough to interfere with his concentration and attention "constantly"[9], even in the performance of simple work tasks;

8.  that Claimant can walk without rest or severe pain for half a block;

9.  that Claimant can sit 5-10 minutes at one time before needing to get up;

10. that Claimant can stand 5-10 minutes at one time before needing to sit down or walk around;

11. that Claimant can sit/stand/walk less than two hours total in an 8-hour working day with normal breaks;

12. that Claimant needs periods of walking around in an 8-hour working day, and that he must walk as often as 1-10 minutes for as long as 6-9 minutes at a time;

---

[9] The questionnaire provides that " 'frequently' means 34% to 66% of an 8-hour working day", thus, "constantly" reasonably means 67% or more of an 8-hour working day. (Tr. at 1246)

13. that in addition to needing a job that permits Claimant to shift positions at will from sitting/standing/walking, and that Claimant will need to take unscheduled breaks during an 8-hour working day;[10]

14. that Claimant should elevate his legs with prolonged sitting;[11]

15. that Claimant must use a cane or other assistive device while engaged in occasional standing/walking;

16. that Claimant can "rarely" lift and carry 10 pounds or less and "never" anything 20 pounds or heavier;

17. that Claimant can "never" twist, crouch/squat, or climb ladders, and "rarely" stoop (bend) or climb stairs;

18. that Claimant has significant limitations with reaching, handling or fingering;[12] and

19. that Claimant is likely to absent more than four days per month as a result of his impairments.

With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[13] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory

---

[10] Dr. Bansal wrote "N/A" as to how often Claimant would need unscheduled breaks. (Tr. at 1247)
[11] Dr. Bansal wrote "N/A" as to how high Claimant must elevate his legs and as to what percentage of an 8-hour workday if Claimant had a sedentary job. (Id.)
[12] Dr. Bansal wrote "N/A" in response as to the percentage of time during an 8-hour workday that Claimant can use his hands/fingers/arms with respect to grasping, turning or twisting objects, fine manipulations, or reaching, including overhead. (Tr. at 1248)
[13] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

29

diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

From the onset, the ALJ did recognize Dr. Bansal as Claimant's "treating neurologist" who saw Claimant for his complaints of "cervical, thoracic and lumbosacral pain with an aching type pain in the legs and occasional numbness and tingling (Exhibits B46F, B49F, B55F, and B73F)[14]."

---

[14] The record shows that these exhibits consist of Dr. Bansal's treatment records dated June 10, 2011 through December 6, 2012 (Tr. at 1510-1517), March 10, 2010 through May 24, 2013 (Tr. at 1594-1617), May 24, 2013 through September 19, 2013, and April 14, 2015 (Tr. at 1909), respectively.

(Tr. at 23) The ALJ primarily found that Dr. Bansal "opined on numerous occasions that the claimant 'is totally and permanently disabled[]' " and referenced the physician's records over several years he treated Claimant's back: "Dr. Bansal also noted that '[a]nytime [the claimant] does any bending, stooping or lifting more than 5 pounds, walks for more than 25 minutes or stands for more than 15-20 minutes or lies down for more than half an hour he has to frequently change posture in order to get some relief' (e.g., Exhibits B11F/14, B17F/7, B49F/12 and B73F/1)" (Tr. at 25) The ALJ then determined

> the limitations in Dr. Bansal's opinions to be excessive and disproportionate to the objective evidence of record discussed in this decision. Furthermore, the limitations are inconsistent with the findings from Dr. Bansal's examination of the claimant. For example, in June 2010 Dr. Bansal noted the claimant had spasms in his neck and back, but only "a mild degree of limitation in cervical and dorsal lumbar spine movements with straight leg raising to be negative" (Exhibit B17F). (Tr. at 1143) Dr. Bansal "could not pick up any sensory changes or motor weakness in the cervical or lumbosacral dermatome" (Id.). Finally, Dr. Bansal noted that the "rest of the neurological examination including . . . cranial nerve examination, muscle tone, strength, reflexes, coordination, gait, station, and tandem walk are basically unremarkable other than Tinel's sign is positive for both median nerves, negative for the ulnar nerve" (Id.). Finally, there is no evidence (i) that Dr. Bansal is familiar with the Social Security disability programs and their evidentiary requirements, or (ii) that Dr. Bansal was familiar with the medical evidence of record when he issued his opinions. (Tr. at 25-26)

Even though Dr. Bansal's June 2010 treatment note apparently contains little variation from those dated March 10, 2010 (Tr. at 1060), July 28, 2010 (Tr. at 1142), April 15, 2011 (Tr. at 1605) and April 14, 2015 (Tr. at 1909), however, each of these "opinions" were Dr. Bansal's treatment records. (Tr. at 25) None of these records contained Dr. Bansal's more thorough analysis of Claimant's limitations that comprised of his responses to the April 5, 2011 questionnaire. To the extent that Dr. Bansal had determined Claimant's impairments disabled him from all work, the ALJ was correct in his notation that "[o]pinions as to disability will not be given controlling weight (20

C.F.R. §§ 404.1527 and 416.927, and SSR 96-5p)." (Id.) Further, though the undersigned notes that

to the extent that Dr. Bansal's responses to the April 5, 2011 questionnaire concerned the

application of vocational factors, and that the determination of a claimant's RFC remains under the

province of the ALJ per 20 C.F.R. §§ 404.1546 and 416.946, nevertheless, "because they are

medical opinions of a treating physician, they *must still be evaluated*[.]" Clark v. Comm'r of Soc.

Sec., No. 09–417, 2010 WL 2730622, at *18 (E.D. Va. June 3, 2010) (quoting 20 C.F.R. §

404.1527(e)) (emphasis added). Sections 404.1527(c) and 416.927(c) explicitly state that

adjudicators "will evaluate every medical opinion we receive" and there is no dispute that the ALJ,

after remand from the Appeals Council, did not mention Dr. Bansal's April 2011 opinion. Indeed,

Dr. Bansal's April 2011 opinion is the ***only*** physical residual functional capacity assessment of

record provided by a treating physician.

The Commissioner correctly notes that "an ALJ is not required to discuss all the evidence

submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not

considered." See Manigo v. Colvin, 2015 WL 74954, at *5 (D. S.C. Jan. 6, 2015) (quoting Craig

v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). Indeed, "there is no particular language or format that

an ALJ must use in his . . . analysis as long as there is sufficient development of the record and

explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–

417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501,

505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in

rendering his decision, but it also provides a thorough examination of the medical evidence." Id.

However, in none of these cited cases was there an instance where a treating physician's opinion

was completely overlooked.

"The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). A reviewing court cannot be "left to guess about how the ALJ arrived at his conclusions." Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015). The ALJ's decision must "include a narrative discussion describing how the evidence supports each conclusion," Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Mascio, 780 F.3d at 636)), and the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." Id. (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

Clearly, the ALJ provided an adequate narrative explaining why he gave Dr. Bansal's *June 2010* opinion that Claimant was disabled and/or far more limited by his impairments than what was noted in the treatment records. However, the ALJ's failure to mention the single RFC assessment in the record provided by a treating physician in this written decision, let alone the absence of the narrative discussion as to whether it was entitled to less than controlling weight, does not lend itself to meaningful judicial review because this Court is "left to guess" as to how the ALJ arrived at his conclusions in the controlling RFC, particularly where the ALJ never addressed Dr. Bansal's own opinion concerning Claimant's RFC. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's treating physician opinion evidence is not supported by substantial evidence.

The RFC Assessment and Fifth Step of the Sequential Evaluation Process:

Because the ALJ neglected treating physician Dr. Bansal's April 2011 opinion, this error could not be cured in the resulting RFC assessment, or at the final step of the sequential evaluation process. There is no dispute that Claimant uses a cane, and the medical evidence supports this: Dr. Bansal wrote in his July 28, 2010 treatment record that he "gave [Claimant] a cane to help him

33

walk better because at times both legs give out and his knee pain also gets worse." (Tr. at 1055) On January 19, 2011, Dr. Bansal noted that "at times both legs give out. [Claimant] is using a cane to walk." (Tr. at 1137) Although these notations indicate that Claimant does use a cane to assist with walking and due to knee pain, there is no further mention in these records that describes in particular the circumstances when he needs to use a cane – such as for prolonged walking and/or standing, uneven terrain, etc. as indicated in the guidelines for adjudicators as provided by the SSA, *supra*.

It is noted however, that the ALJ reviewed Claimant's physical examinations, particularly those findings reported in Dr. Bansal's own treatment notes, that demonstrated Claimant had normal muscle tone, strength, coordination, gait, station and could tandem walk. (Tr. at 26) As the factfinder, the ALJ reconciled this conflicting evidence and would normally be entitled to adopt the opinions provided by the other medical experts that the evidence simply did not show Claimant's cane was "medically required" as defined by the SSA.[15] However, because Dr. Bansal opined in his lumbar RFC assessment, *supra*, that Claimant must use a cane or other assistive device, the ALJ had a duty to consider and evaluate this opinion along with the other medical opinions of record for crafting Claimant's RFC, particularly when Dr. Bansal opined that Claimant needed a cane even while engaged in occasional standing or walking and the RFC specifically allowed for a sit/stand option.

The ALJ did not properly evaluate Dr. Bansal's opinion with respect to Claimant's cane use, therefore again, the Court is "left to guess" if the use of a cane would have significantly eroded the unskilled sedentary occupational base pursuant to SSR 96-9p. 1996 WL 374185, at *7.

---

[15] Per Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) and its progeny, the ALJ had discretion to make a finding if the evidence demonstrated that Claimant's use of a cane was "medically required."

Indeed, the relevant colloquy between the ALJ and the vocational expert is as follows:

Q.     [I]f you take the first hypothetical and also assume the individual needs to use a handheld assistive device at all times when standing, what effect, if any, would that have on the jobs and numbers cited?

A.     If such an individual has to stand at 30-minute intervals during the time that he was standing, he would need to have one hand to hold the cane. Therefore, he could not do sedentary work.

(Tr. at 49) Because Dr. Bansal opined that Claimant must use a hand-held assistive device for even occasional standing, the ALJ's omission in discussing this relevant and probative evidence is reversible error.

With regard to his carpal tunnel syndrome, however, the ALJ noted Claimant's statements that he continued to experience numbness and swelling in his hands which caused him to drop things and to lose his grip (Tr. at 22), but the ALJ also compared this with the medical evidence, in referencing Claimant's "submaximal effort during grip strength testing" and that Claimant reported doing well following his carpal tunnel release surgery. (Tr. at 24, 1223, 1669) Further, even though the ALJ credited Dr. Bansal's June 2010 opinion "some weight" because Claimant "should 'avoid repetitive hand motion' " since it was consistent with the carpal tunnel diagnosis and lateral epicondylitis of the left elbow, it is important to recognize that this opinion predated Dr. Nutter's first evaluation by nearly eight months as well as the surgical releases by over three years. (Tr. at 25, 1056-1057)

As previously noted, the most recent medical treatment records concerning treatment for Claimant's carpal tunnel syndrome are from September 2013. During both Dr. Nutter's evaluations, he observed that Claimant could write and pick up coins with either hand without difficulty and could make fists bilaterally. (Tr. at 1223, 1780) The most recent medical opinion of

record with respect to Claimant's carpal tunnel issues is from Dr. Kendrick, who based his opinion on the April 19, 2012 nerve conduction studies confirming Claimant's "moderate bilateral carpal tunnel syndromes" (Tr. at 1353-1354), Dr. Novotny's treatment record dated August 21, 2013 (Tr. at 1671), and the Cabell Huntington Hospital surgical record concerning the left open carpal tunnel release dated September 27, 2013 (Tr. at 1690). (Tr. at 1888) Dr. Kendrick opined that the medical record of evidence supported a finding that Claimant can frequently handle, finger, feel and push/push with both hands ("Frequently means from one-third to two-thirds of the time" during an 8-hour day, 5 days a week or equivalent work schedule) (Tr. at 1891), as opposed to continuously doing such activities ("Continuously means more than two-thirds of the time" (Id.). (Tr. at 1893)

At steps four and five of the sequential analysis, the Regulations mandate that an ALJ must determine a claimant's RFC for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545, 416.945. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1546, 416.946.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

> Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

There is no dispute that the ALJ's manipulative limitations mirror the medical opinion provided by Dr. Kendrick. Though Claimant contends that he is disabled due to his use of a cane and chronic symptoms related to his carpal tunnel syndrome, there is simply no evidence that Claimant received additional treatment following his bilateral carpal tunnel releases in September 2013 that would support his claim of continued symptomatology related to his carpal tunnel syndrome. As observed by the ALJ, the objective medical evidence did not corroborate Claimant's subjective complaints with respect to his hands. In short, his physical impairments, though severe, did not demonstrate a related functional loss to equate to a disability finding. If the symptoms associated with his carpal tunnel syndrome can be reasonably controlled by treatment, the impairment is not disabling. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). In this case, the lack of treatment records regarding carpal tunnel syndrome since September 2013 suggests Claimant's carpal tunnel syndrome was effectively treated by surgery.

Because the objective medical evidence of record did not indicate Claimant's bilateral carpal tunnel syndrome had demonstrably greater limitations than those supported by the medical records, the ALJ only had to provide a hypothetical question to the vocational expert that included those credibly-established limitations as supported by the record. Walker v. Bowen, 889 F.2d 47,

50 (4th Cir. 1989). That is, the substantial evidence supported the ALJ's finding that Claimant could "lift and carry up to 15 pounds occasionally, 10 pounds frequently" and that "[h]e can frequently reach in all directions (including overhead), handle, finger, feel, and push/pull with both hands." (Tr. at 21)

Nevertheless, because the ALJ did not consider the April 2011 RFC assessment provided by Claimant's treating neurologist, Dr. Bansal, where the Regulations provide that such consideration is mandated, the undersigned **FINDS** that the resulting RFC with respect to Claimant's use of a cane or hand-held assistive device, is not supported by substantial evidence. Accordingly, the undersigned **FINDS** that the ALJ did not fairly account for Claimant's impairments as they related to his use of a cane because the ALJ failed to consider the opinion evidence provided by Dr. Bansal in the April 2011 lumbar RFC questionnaire, and further **FINDS** that the hypothetical posed to the vocational expert that incorporated the limitations associated with those impairments was not supported by the substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (ECF No. 14), **DENY** the Defendant's request to affirm the decision below (ECF No. 19), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to properly consider and evaluate Dr. Bansal's medical source statement as contained in his responses to the April 2011 lumbar RFC questionnaire.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: September 13, 2018.

Omar J. Aboulhosn
United States Magistrate Judge